UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD B. FISCHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV01798 ERW |
| | ) | |
| J. SAM STEWARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the Motion to Dismiss and for Summary Judgment

of Defendants City of St. Charles, Missouri, James Gooch, Timothy Swope, and Robert Boerding

[doc. #102], Defendant J. Sam Steward's Motion for Summary Judgment [doc. #105], and

Defendant Rachel A. Smith's Motion for Summary Judgment [doc. #107].

**I.     BACKGROUND FACTS[1]**

Plaintiff Richard B. Fischer ("Plaintiff") is a police officer with the police department of

the City of St. Charles, Missouri.  This litigation concerns a report of sexual abuse filed against

Fischer by Jane Doe ("Doe") in July 2004, the resulting criminal investigation into the complaint,

the subsequent criminal prosecution, and the corresponding effects on Fischer's employment.

Plaintiff first encountered Doe when investigating a domestic violence incident, to which

Doe was a witness, in March 2004.  In the course of that investigation, Plaintiff was unable to

secure all of the necessary information, and therefore needed to conduct a follow-up interview

with the alleged victim or Doe in order to complete his official report.  Then, in July 2004,

---

[1] The Court's recitation of the facts is taken from the parties' statements of material facts
and responses thereto, filed with reference to the Motions listed above.

Plaintiff encountered Doe at a St. Charles gas station while on patrol, where she informed Plaintiff of the prior connection. Later that evening, while on patrol, Plaintiff observed a vehicle that was blocking a roadway. Plaintiff approached the vehicle and found Doe and a male passenger, MP, in a "romantic position." Plaintiff advised them to move their vehicle to the side of the roadway and then proceeded with his patrol. As he was driving away, however, Plaintiff realized that he might be able to obtain the additional information about the domestic violence incident from Doe, and returned to Doe's vehicle to arrange a time to meet with her. Plaintiff told Doe that he would be watching traffic and writing reports for the remainder of his shift, and Doe advised him that she would be done shortly and that she would contact him.

Plaintiff then proceeded to a parking lot of a bowling alley and restaurant in St. Charles, where he parked his vehicle to watch traffic at a specific intersection. After he was parked in that location for five to ten minutes, Doe approached in her vehicle and pulled up alongside Plaintiff, this time without MP. According to Plaintiff, he quickly realized that Doe was not able to provide all of the information he needed, so he wrote his work phone number on a piece of paper and gave it to her, in the hope that she would have the alleged victim call him.

In response to some comments from Doe about the suspect in that incident, Plaintiff began to explain how to obtain an ex parte order of protection, when a vehicle pulled into the parking lot. Because they were blocking the driveway, Plaintiff told Doe to move to the other side of the business if she wished to continue the conversation. Doe then pulled forward, around to the back side of the business, and Plaintiff followed. After stopping there, Plaintiff exited his vehicle in order get an informational card on ex parte orders from the trunk of his vehicle. Some amount of time later, Plaintiff departed to respond to a call for law enforcement.

Early the following morning, on July 25, 2004, Doe made a formal complaint with the St. Charles police department, alleging that while she was behind the business with Plaintiff, he rubbed up against her with an obvious erection, and that he pulled down her shirt and licked her breast. Due to the possible conflict of interest within the police department, Defendant J. Sam Steward ("Steward"), a sergeant with the Missouri State Highway Patrol ("MSHP"), was assigned to investigate Doe's criminal allegations. Defendant Rachel A. Smith ("Smith") was appointed Special Prosecutor for St. Charles County – likewise for conflict of interest reasons – to prosecute any criminal charges that might arise from Steward's investigation. Some time thereafter, Smith, apparently concerned about leaks within the department, obtained an order from the St. Charles County circuit court that prohibited the disclosure to Plaintiff of any documents or materials related to the investigation without leave of the court.[2] It does not appear from the record that Plaintiff ever requested such leave.

The St. Charles police department also initiated an internal administrative investigation around this same time, headed by Lieutenant Dennis Corley ("Corley"). In conjunction with that investigation, Plaintiff gave what is known as a *Garrity* statement – a compelled statement by a police officer concerning an incident or complaint that is not admissible in a subsequent criminal prosecution absent a waiver.[3] Where there are two such parallel investigations, standard protocol is that information from the criminal investigation is shared with the administrative investigation, but not vice versa. When Smith sought to obtain materials related to the initial criminal investigation from the St. Charles police department, however, Smith also received Plaintiff's

---

[2] This order was later declared void *ab initio*.

[3] *See Garrity v. State of N.J.*, 385 U.S. 493 (1967).

*Garrity* statement. Upon discovering it, Smith states that she immediately returned it to the police department.

When Doe made her formal complaint with the St. Charles police department, law enforcement performed a sexual assault kit, taking swabs from her right breast to test for DNA and seizing her shirt for the same purpose – evidence that was subsequently turned over to Steward and the MSHP. Corley and Steward also learned from Doe in the following days that, contrary to her earlier statements to police, she had sexual contact with her boyfriend and with MP prior to the alleged incident with Plaintiff, and that MP may have also licked her breast. Corley and Steward concluded that she had misrepresented these facts because she did not want her boyfriend and her mother to learn that she had been with MP.

As a result of this new information, Steward obtained DNA samples from MP and Doe, and had Brian Hoey ("Hoey") of the MSHP crime lab perform a comparison with the samples taken on the day of the complaint. The comparison test revealed that MP's DNA was consistent with the DNA found on the breast swab. The second test indicated that the DNA detected on a stain on Doe's shirt was consistent with a mixture of DNA from at least three individuals, and neither Doe nor MP could be eliminated as possible contributors. Although Hoey issued the two lab reports on March 4, 2005, and April 7, 2005, respectively, it is unclear from the record whether Smith was aware of the results before she presented her case to the grand jury.[4] Plaintiff maintains that he expressly offered to give a DNA sample so that the crime lab could also test it against the samples taken pursuant to Doe's complaint, but Smith decided not to seek DNA from

---

[4] It is undisputed that Smith did not receive the physical reports until September 2005 due to a mailing error, but the recollections of Smith and Hoey are unclear concerning the extent to which they discussed the results prior to the grand jury proceeding. Steward was aware of the results by that time, however, and Smith also seems to indicate in her deposition testimony that she at least knew that Doe's clothing sample had yielded three possible DNA sources.

Plaintiff until she determined whether a grand jury would indict Plaintiff based on other available evidence.[5] According to Smith, she hoped that Plaintiff would testify before the grand jury in order to give her some insight into the relative credibility of Doe and Plaintiff, and she also contemplated the possibility that Plaintiff would expose himself to a perjury charge by denying sexual contact with Doe. Smith believed, however, that Plaintiff's attorney would advise him not to testify if Plaintiff had given a DNA sample and did not yet know the results of the comparison.

In connection with the internal investigation, the MSHP also conducted a polygraph examination of Plaintiff concerning Doe's allegations in September 2004. At the time, the St. Charles police department had a policy in place that if an officer was a subject of a formal complaint and the complainant agreed to be polygraphed, the officer would also be required to do so. Doe had initially agreed to take a polygraph examination, but the interview never took place. The record suggests that, at the time Plaintiff was polygraphed, the police department was under the impression that Doe's assent entitled them to compel Plaintiff to submit to an examination pursuant to the department's policy, although the Doe interview had not yet occurred or been formally scheduled. Following Plaintiff's test, the examining officer reported his opinion that Plaintiff was being deceptive based on "slight indications of lying," and that he wished to re-examine Plaintiff at a later date to clarify the results.

In May 2005, the St. Charles County grand jury indicted Plaintiff on felony and misdemeanor charges arising out of Doe's allegations, based on testimony from Doe and Steward. Smith informed the grand jury about Doe's other sexual contact on the night in question, and that Doe had initially denied other sexual contact and had instructed MP to support her story. Smith

---

[5] Smith claims that she was not aware of Plaintiff's offer, but she did state that she had considered the possibility of obtaining a DNA sample from Plaintiff – either by consent or otherwise – before presenting her case to the grand jury.

also told the grand jury that law enforcement would run comparison DNA tests with Plaintiff's DNA if it indicted Plaintiff. Neither she nor Steward mentioned the tests comparing MP's DNA sample with the samples taken from Doe's person and clothing on the night of the complaint. The St. Charles police department immediately suspended Plaintiff without pay upon learning of the indictment.

On that same day, Smith obtained and had police execute a search warrant for Plaintiff's DNA. The crime lab issued its report in August 2005, finding that Plaintiff's DNA was inconsistent with the DNA samples from the swab of Doe's breast and her clothing. Steward informed Smith of these findings in September 2005, and in October 2005, following a meeting between Smith and Doe, the criminal charges against Plaintiff were formally dismissed.

Based on this series of events, Plaintiff asserts claims under 42 U.S.C. § 1983 against Steward and Smith, alleging that they violated his Fourteenth Amendment rights by failing to investigate and disclose exculpatory evidence. In addition, Plaintiff brings § 1983 claims against the City of St. Charles, Missouri ("St. Charles"), James Gooch ("Gooch") (St. Charles' interim chief of police from early 2004 through January 4, 2005), Timothy Swope ("Swope") (St. Charles' chief of police from March 2005 through May 2007), and Robert Boerding ("Boerding") (St. Charles' assistant chief of police from March 2005 through May 2007) (collectively, "St. Charles Defendants"), alleging that they violated his Fourteenth Amendment rights by failing to disclose exculpatory evidence and by not conducting an administrative hearing before suspending him without pay based on the criminal indictment. Plaintiff also asserts state law claims against all Defendants for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy.

## II.    LEGAL STANDARDS

### A.    *Motion to Dismiss*

A complaint should be dismissed for failure to state a claim when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Casazza v. Kiser*, 313 F.3d 414, 418 (8th Cir. 2002) (*quoting Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  In considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must assume that all material facts alleged in the complaint are true.  *Davis v. Monroe City Bd. of Educ.*, 526 U.S. 629, 633 (1999) (*quoting Summit Health Ltd. v. Pinhas*, 500 U.S. 322, 325 (1991)).  "However, the complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal." *DuBois v. Ford Motor Credit Co.*, 276 F.3d 1019, 1022 (8th Cir. 2002).  Additionally, the allegations in the complaint must be viewed "in the light most favorable to the plaintiff." *Casazza*, 313 F.3d at 418 (*citing Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995)).  Finally, dismissal under Rule 12(b)(6) should be granted "only in the unusual case in which a plaintiff includes allegations that show, on the face of the complaint, that there is some insuperable bar to relief." *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir. 2004) (internal citations omitted).

### B.    *Motion for Summary Judgment*

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine

material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. If the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden shifts to the non-moving party to set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e)(2). When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden and survive summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

In ruling on a motion for summary judgment, the Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual

issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.*

## III.   DISCUSSION

Defendants move for summary judgment on all of Plaintiff's claims. The St. Charles Defendants also argue that Plaintiff's § 1983 procedural due process claims should be dismissed as unripe for adjudication.

### A.      *§ 1983 Failure to Investigate Exculpatory Evidence Claims against Smith and Steward*

Defendants Smith and Steward contend that they are entitled to summary judgment on these § 1983 claims. Smith, sued only her official capacity as Special Prosecutor, argues that Plaintiff has failed to make sufficient allegations or present any evidence supporting an official capacity claim. Steward, sued in both his individual and official capacities, claims that Plaintiff has failed to allege or demonstrate that his constitutional rights were violated.

At the outset, the Court notes that the defenses of absolute and qualified immunity are not available to individuals sued in their official capacities. *Davis v. Hall*, 375 F.3d 703, 710 n.3 (8th Cir. 2004) ("[N]either qualified nor absolute immunity is available to [a defendant sued] in his official capacity."). This is because a suit against an individual in her official capacity is the equivalent of a suit against the entity for which she works, *Hafer v. Melo*, 502 U.S. 21, 25 (1991), and governmental entities are not entitled to absolute or qualified immunity. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).

Because Plaintiff's official capacity claim against Smith is equivalent to a § 1983 claim against St. Louis County, Plaintiff must establish the necessary prerequisite to governmental liability under § 1983: proof that an official custom or policy brought about the alleged constitutional deprivation. *Hafer*, 502 U.S. at 25; *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91 (1978). An unconstitutional government policy may be found based on a "single decision taken by the highest officials responsible for setting policy in that area of the government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality) (internal citations omitted). A single decision can only set government policy, however, where it is made by an individual with final policymaking authority in that area of the entity's business, a question of state law. *Id.* at 124-27. It is not necessary for the final policymaker to intend that the decision will apply to a wide range of situations; even a decision "tailored to a particular situation and not intended to control decisions in later situations" may be official policy for § 1983 purposes if it is "properly made by that government's authorized decisionmakers." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (plurality).

Smith is entitled to summary judgment on this claim because Plaintiff has completely failed to allege in his Complaint that Smith had policymaking authority, that there was an unconstitutional policy in place, or that an unconstitutional policy caused his injury. In fact, Plaintiff did not pursue this theory – apart from pleading that this claim is against Smith in her official capacity – until Smith noted the complete lack of any such allegations in Plaintiff's Complaint. As such, the Court must grant summary judgment in favor of Smith because a complaint lacking the "barest reference to a custom or policy . . . fail[s] to satisfy even the liberal pleading requirements for § 1983 municipal liability." *Blackett v. Rapid City Area School Dist.*, 1

Fed. Appx. 589, 591 n.5 (8th Cir. 2001) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1992)).

Even if Plaintiff had adequately pled this claim against Smith, both Smith and Steward would still be entitled to summary judgment on these § 1983 claims because Plaintiff has not alleged a colorable constitutional violation. Plaintiff appears to argue that he had a right to pre-indictment DNA testing as a matter of Fourteenth Amendment substantive due process, and that the failure to obtain a DNA sample from him and test it against Doe's sample, before seeking the grand jury indictment, is therefore an actionable constitutional deprivation. The Court is aware of no authority, however, indicating that a failure to investigate exculpatory evidence is constitutionally significant where it is not tethered to a liberty or property interest – that is, where the individual is not ultimately convicted for the alleged crime. Nonetheless, Plaintiff contends that Smith and Steward had a constitutional obligation to perform additional investigation, including DNA testing, which would have exonerated him prior to the grand jury proceeding.

In support of this proposition, Plaintiff cites to *Kuehl v. Burtis*, in which the court stated that "probable cause [to make an arrest] does not exist when a 'minimal further investigation' would have exonerated the suspect." 173 F.3d 646, 650 (8th Cir. 1999). *Kuehl*, however, deals exclusively with the Fourth Amendment, and Plaintiff offers no explanation as to why it would be relevant in the Fourteenth Amendment context. Furthermore, as the court's examples of such "minimal further investigation" in *Kuehl* illustrate – interviewing witnesses at the scene of the alleged crime, inquiring if a crime was in fact committed – the court's statement is premised on a situation in which police base probable cause on certain evidence while ignoring other, equally available and relevant evidence. *See id.* In short, *Kuehl* merely states that probable cause does

not exist where police fail to ascertain whether existing evidence would negate it; it does not impose an obligation on police to collect and test a suspect's DNA before seeking an indictment.

Indeed, the Supreme Court's pronouncements in this area demonstrate that due process does not require pre-indictment DNA testing, regardless of how feasible or instructive it may be. In *Youngblood*, the defendant's expert testified at trial that had the prosecution timely performed tests of semen samples taken into evidence, instead of waiting until later when the results were inconclusive, the defendant could have been completely exonerated. *Ariz. v. Youngblood*, 488 U.S. 51, 53-55 (1988). The state court of appeals reversed the defendant's conviction, finding that due process is violated where "identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as the perpetrator," *id.* at 54, but the Supreme Court disagreed:

> If the [state court of appeals] meant . . . that the Due Process Clause is violated when the police fail to use a particular investigatory tool, we strongly disagree. The situation here is no different than a prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but *the police do not have a constitutional duty to perform any particular tests.*

*Id.* at 59 (emphasis added). More recently, the Supreme Court has recognized the line-drawing problems that would result from recognizing a constitutional right to DNA testing. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308 (2009). In *Osborne*, the Court addressed the argument that due process requires post-conviction access to relevant evidence, where the evidence had initially been subjected to a less accurate means of DNA testing than is currently in widespread use. *Id.* at 2314-15. The Court unequivocally held that there is no such right, at least as a matter of substantive due process, and noted the potential pitfalls of constitutionalizing the issue:

We would soon have to decide if there is a constitutional obligation to preserve forensic evidence that might later be tested. If so, for how long? Would it be different for different types of evidence? Would the State also have some obligation to gather such evidence in the first place? . . .

. . . .

. . . At the end of the day, there is no reason to suppose that [federal courts'] answers to these questions would be any better than those of state courts and legislatures, and good reason to suspect the opposite.

*Id.* at 2323.

*Youngblood* and *Osborne* foreclose this constitutional claim. Under *Youngblood*, because an accused does not have any right to have certain tests performed in the course of a criminal investigation, Smith could have obtained a constitutionally valid conviction without performing any DNA testing at all. *Cf. State v. Paulson*, 220 S.W.3d 828, 833 (Mo. Ct. App. 2007) (uncorroborated testimony of sexual assault victim sufficient to support criminal conviction). As such, the Court could hardly conclude that Plaintiff had a right to DNA testing before he was indicted. Moreover, Plaintiff seems to argue that the Court should recognize this right as a matter of substantive due process, yet he provides no rationale for distinguishing the Supreme Court's refusal in *Osborne* to recognize an analogous post-conviction right. Recognition of a right to pre-indictment DNA testing would implicate precisely the same line-drawing concerns set out in *Osborne*, and it would also create immensely difficult questions regarding whether the results of a certain DNA comparison would in fact exonerate the accused.

The Court therefore concludes that Smith and Steward are entitled to summary judgment on Plaintiff's § 1983 claims alleging a failure to investigate exculpatory evidence. Plaintiff has failed to make allegations sufficient to support an official capacity claim against Smith, in that he has not alleged that an unconstitutional custom or policy of St. Charles County caused his alleged constitutional injury. Even if Plaintiff had adequately pled that claim, moreover, Smith and Steward would both be entitled to summary judgment on these claims because existing authority

demonstrates that Plaintiff had no constitutional right to pre-indictment DNA testing as a matter of substantive due process.

**B.      § 1983 *Brady* Claims against All Defendants**

Defendants assert that they are entitled to summary judgment on Plaintiff's claims alleging a failure to disclose exculpatory evidence because, among other reasons, Defendants had no obligation to share such evidence with him.  Plaintiff has not responded to any of Defendants' motions for summary judgment on these claims.

A constitutional claim alleging a failure to disclose exculpatory evidence, commonly known as a *Brady* claim, is based on the principle that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Md.*, 373 U.S. 83, 87 (1963).  *Brady*, however, has no application at the pre-indictment stage; a prosecutor has no duty to search for or otherwise provide favorable evidence to the target of an indictment.  *See, e.g.*, *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005) ("Under the rule in our circuit[,] *Brady* does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial."); *United States v. Kime*, 99 F.3d 870, 882 (8th Cir. 1996) (due process satisfied where prosecution disclosed impeachment evidence during cross-examination of prosecution witness).

Plaintiff has no legal or factual grounds for asserting *Brady* claims against Defendants. Plaintiff argues solely that Defendants violated his constitutional rights by not providing him, *before* the grand jury proceeding, with the results of the tests comparing the DNA samples taken from Doe's person and clothing with samples of Doe's and MP's DNA.  Defendants had no constitutional obligation to provide that evidence to Plaintiff at that juncture, and Plaintiff does

not contend that Defendants otherwise concealed evidence after the grand jury handed down the indictment. Moreover, as with Plaintiff's failure to investigate claim, Plaintiff has not offered any authority or rationale for applying *Brady*, a procedural due process decision, to a situation in which the accused was not ultimately convicted.

The Court therefore concludes that Defendants are entitled to summary judgment on Plaintiff's § 1983 claims alleging *Brady* violations, as *Brady* does not impose an obligation on prosecutors to disclose exculpatory evidence at the pre-indictment stage, and it also does not create a substantive due process right to such evidence.[6]

### C.    § 1983 Procedural Due Process Claims against St. Charles Defendants

The St. Charles Defendants[7] argue that they are entitled to summary judgment on Plaintiff's procedural due process claims because he did not have any right to a pre-deprivation hearing and did not exhaust his available administrative remedies following his suspension. Plaintiff appears to contend that the St. Charles Defendants' actions unconstitutionally denied him both meaningful pre-deprivation and post-deprivation process.

Although it is true that a plaintiff asserting a procedural due process violation generally must exhaust available state administrative remedies as a prerequisite to stating a valid claim under § 1983, a plaintiff who claims that he was entitled to pre-deprivation process is not required to exhaust post-deprivation remedies. *Keating v. Neb. Pub. Power Dist.*, 562 F.3d 923, 929 (8th Cir. 2009). It is undisputed that Plaintiff did not request a post-suspension hearing although he

---

[6] Defendants assert a number of additional arguments in favor of summary judgment on these *Brady* claims, many of which are sound. For the sake of brevity, however, the Court has seized on the one ground that is applicable to all Defendants.

[7] Again, this term refers collectively to Defendants Gooch, Swope, Boerding, and the City of St. Charles, Missouri.

was given the opportunity to do so – that is, it is undisputed that he did not exhaust his post-deprivation remedies.[8]  Thus, the St. Charles Defendants' argument that Plaintiff's claim is not ripe assumes that Plaintiff was only entitled to post-deprivation process, and the Court therefore must first consider whether Plaintiff did in fact have a due process right to a hearing before the police department suspended him without pay.[9]

The parties do not dispute that due process applies here, in that Plaintiff had a property interest in his continued paid employment as a police officer with the St. Charles police department.  The Supreme Court, however, has repeatedly "rejected the proposition that [due process] *always* requires the State to provide a hearing prior to the initial deprivation of property."  *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (emphasis and alterations in original) (internal quotations and citations omitted).  Instead, determining what process is due requires the balancing of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Under these *Mathews* factors, "[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless

---

[8] Plaintiff's argument that exhaustion should not be required because the available post-deprivation remedies were inadequate is addressed below.

[9] Plaintiff's contention that the St. Charles Defendants violated police department policy in not providing Plaintiff a pre-deprivation hearing is not relevant for purposes of his § 1983 action.  While a property interest is created and defined "by existing rules or understandings that stem from an independent source such as state law," the process that is due in order for an individual to be deprived of that interest is strictly a constitutional matter.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 541 (1985).  As such, the department's policy concerning hearings for suspended employees is not of constitutional significance; the sole question here is what process the Fourteenth Amendment requires.

or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988).

Accordingly, the Supreme Court has specifically held that procedural due process does not require a pre-suspension hearing in order to temporarily suspend a police officer charged with a felony without pay. *See Gilbert*, 520 U.S. at 932-34. In *Gilbert*, the Court recognized the State's "significant interest in immediately suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility, such as police officers." *Id.* at 932. Turning to the risk of an erroneous deprivation and the value of additional process, the Court noted the assurances provided by the indictment, in that "the arrest and formal charges imposed . . . by an independent body demonstrate that the suspension is not arbitrary." *Id.* at 934 (internal quotations, citations, and alterations omitted).

Plaintiff's position does not differ in any material respect from the position of the plaintiff in *Gilbert*. The city's interest in removing persons allegedly responsible for sexual assaults from active law enforcement is undoubtedly an important one. Likewise, the police department's action was accompanied by "a substantial assurance that the deprivation [was] not baseless or unwarranted," *id.* – the grand jury proceeding and corresponding indictment. As in *Gilbert*, the independent findings of the grand jury indicate that additional process would not do much, if anything, to decrease the risk of an erroneous deprivation, as there is little reason to believe that an administrative hearing would have somehow been a more accurate or fairer means of determining whether there was cause to believe Plaintiff had committed the alleged crime. Moreover, even if Plaintiff had been afforded a hearing, and had persuaded the department that he had not committed the offenses, *Gilbert* establishes that the department still would have been

justified in suspending him based on the indictment. The Court therefore concludes that Plaintiff's due process rights did not require the St. Charles Defendants to provide Plaintiff with a pre-deprivation hearing.

Having determined that Plaintiff was not entitled to a hearing before his suspension without pay, the Court turns to Plaintiff's contention that the post-deprivation process provided by the St. Charles police department was inadequate. In order for Plaintiff to have a viable claim on this issue, he must have exhausted his available administrative remedies. *See Wax 'n Works v. City of St. Paul*, 213 F.3d 1016, 1019 (8th Cir. 2000). The failure to exhaust these remedies means that the claim is not ripe for adjudication, and must be dismissed for lack of jurisdiction. *Crooks v. Lynch*, 447 F.3d 846, 848-49 (8th Cir. 2009) (dismissing procedural due process claim regarding termination where the plaintiff had a pending state court appeal concerning his discharge). The Eighth Circuit recognizes three exceptions to the exhaustion requirement, however: (1) where exhaustion would be futile; (2) where the administrative remedies cannot provide adequate relief; and (3) where there is an established agency policy or widespread practice that is contrary to law. *See Blackmon ex rel. Blackmon v. Springfield R-XII School Dist.*, 198 F.3d 648, 656 (8th Cir. 1999).

Plaintiff admits that he was made aware of his right to appeal his suspension following the criminal indictment, and that he chose not to appeal; thus, he must establish that an exception to the exhaustion requirement applies. Plaintiff suggests that he could not, as a practical matter, have appealed the suspension because the administrative investigation was held in abeyance while the criminal matter was pending. Assuming that would in fact have made him unable to appeal, Plaintiff fails to mention that it was his own attorney who requested that the St. Charles police

department hold the administrative matter in abeyance; Plaintiff can hardly suggest that the St. Charles Defendants are responsible for that alleged obstacle.

Plaintiff also claims that an appeal would have been futile because the judge in the criminal matter had issued an order prohibiting any disclosure to Plaintiff of materials from the investigation. That order, however, permitted Plaintiff to seek leave of the court to obtain such materials, and Plaintiff did not do so. Moreover, Plaintiff could not have disputed the fact of his criminal indictment, which, as the Court concluded above, provided the necessary grounds for his suspension. In sum, Plaintiff has not demonstrated that he had sufficient grounds for choosing not to exhaust his available administrative remedies, and as such, his failure to appeal his suspension is fatal to his claim that he was not afforded sufficient post-deprivation process.

The Court therefore concludes that the St. Charles Defendants are entitled to judgment in their favor on Plaintiff's § 1983 procedural due process claims. To the extent Plaintiff alleges due process violations in the lack of a hearing before his suspension without pay, the St. Charles Defendants are entitled to summary judgment, as the criminal indictment provided a sufficient basis for an immediate suspension. With respect to Plaintiff's allegations that the available post-deprivation remedies did not satisfy due process, Plaintiff's § 1983 claims must be dismissed as unripe because he failed to exhaust his available administrative remedies by appealing the suspension.

### D. Tort Claims against Smith and the City of St. Charles

Although the parties have not raised the issue, Plaintiff's state law tort claims against Smith and the City of St. Charles for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy[10] implicate the doctrine of sovereign immunity.[11]

Mo. Rev. Stat. § 537.600 provides that Missouri public entities, including counties and municipal corporations, are entitled to sovereign immunity as it existed at common law prior to September 12, 1977, unless that immunity is waived, abrogated, or modified by statute. *See Richardson v. City of St. Louis*, 293 S.W.3d 133, 136 (Mo. Ct. App. 2009) (municipal corporations are public entities under § 537.600); *Ford v. Cedar County*, 216 S.W.3d 167, 170 (Mo. Ct. App. 2006) (applying § 537.600 in suit against county). A suit against a government employee in her official capacity is equivalent to a suit against the government entity itself, and sovereign immunity therefore also applies with equal force in the context of official capacity claims. *See Betts-Lucas v. Hartmann*, 87 S.W.3d 310, 327 (Mo. Ct. App. 2002).

As such, Plaintiff's claim against Smith, in her official capacity as Special Prosecutor of St. Charles County, is in effect a suit against the County. Missouri counties, as political subdivisions of the state, are entitled to full common-law sovereign immunity. *Halamicek Bros., Inc. v. St. Louis County*, 883 S.W.2d 108, 109 (Mo. Ct. App. 1994); *State ex rel. Mo. Dep't of Agric. v. McHenry*, 687 S.W.2d 178, 182 n.5 (Mo. 1985). Plaintiff has not offered any authority indicating

---

[10] As discussed more fully below, civil conspiracy is a liability theory for tortious conduct and not a freestanding tort. *See 8000 Maryland, LLC v. Huntleigh Fin. Servs. Inc.*, 292 S.W.3d 439, 451 (Mo. Ct. App. 2009). As such, the ultimate question is whether these Defendants may be held liable in tort for malicious prosecution or intentional infliction of emotional distress.

[11] When suing a public entity, a plaintiff bears the burden of establishing that sovereign immunity does not apply; it is not an affirmative defense that is waived if not pled and proved by the defendant. *See Richardson v. City of St. Louis*, 293 S.W.3d 133, 137 (Mo. Ct. App. 2009).

that the legislature has abrogated this immunity with respect to liability for malicious prosecution or intentional infliction of emotional distress, and accordingly Smith is entitled to summary judgment on Plaintiff's tort claims on grounds of sovereign immunity.

Unlike Missouri counties, Missouri municipalities were not entitled to full sovereign immunity at common law; instead, they are immune with respect to governmental but not proprietary functions. *Southers v. City of Farmington*, 263 S.W.3d 603, 609 (Mo. 2008) (en banc). A particular function is governmental if it is "performed for the common good of all," whereas a proprietary function is one "performed for the special benefit or profit of the municipality acting as a corporate entity." *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. 1996) (en banc), *abrogated on other grounds by Southers*, 263 S.W.3d 603. As the governmental-proprietary distinction implies, a municipal corporation enjoys this more limited form of sovereign immunity precisely because it, unlike a state political subdivision such as a county or township, can act purely in pursuit of private interests, in which case there is no longer any reason to view the municipality as an extension of the state. *See City of St. Louis v. Gurno*, 12 Mo. 414, 1849 WL 4163, at *4 (Mo. 1849) ("Where a municipal corporation engages in an undertaking, having no reference to her municipal duties, or the interests of the public at large, but merely for her own private emolument or convenience, she is then upon the same foot with any individual or private corporation, and is unquestionably answerable for her acts precisely to the same extent that an individual would be."); *see also Wood v. Jackson County*, 463 S.W.2d 834, 835 (Mo. 1971).

The City of St. Charles, as a municipality, performs a governmental function when it provides a police department, and is therefore insulated by sovereign immunity from Plaintiff's

tort claims concerning the department's actions.[12]  *See Parish v. Novus Equities Co.*, 231 S.W.3d 236, 242 (Mo. Ct. App. 2007) ("Keeping the peace, enforcing laws and ordinances, and preserving the public health are just some of the duties within the province of a municipality as a governmental agency and upon which the municipality acts without liability.").  As with Plaintiff's tort claims against Smith, the Court is not aware of any authority suggesting that this immunity has been waived or otherwise modified for the tort claims at issue here, and sovereign immunity therefore applies.

In sum, the Court concludes that sovereign immunity bars Plaintiff's tort claims against Smith and the City of St. Charles for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy.  The claims against Smith in her official capacity are equivalent to claims against St. Charles County, which is entitled to full sovereign immunity.  The City of St. Charles may only assert sovereign immunity with respect to its governmental functions, but the provision of a police department is unquestionably such a function, and accordingly sovereign immunity applies to Plaintiff's tort claims against the City arising out of the department's actions.

### E.     Tort Claims against Steward, Gooch, Swope, and Boerding

These remaining Defendants argue that they are entitled to summary judgment on Plaintiff's claims for malicious prosecution and intentional infliction of emotional distress because the undisputed facts demonstrate that he cannot prove the requisite elements of either tort.[13]

---

[12] The Court also notes that in any event, the City of St. Charles would not be a proper defendant to Plaintiff's malicious prosecution claim, as it was St. Charles County that was responsible for the prosecution of the criminal case.

[13] These Defendants also raise the affirmative defense of official immunity, which bars civil claims arising out of discretionary acts by state actors that are not carried out in bad faith or with malice.  *See State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446-47 (Mo. 1986).  The Court finds, however, that because malicious prosecution requires malice and intentional infliction of emotional distress requires extreme or outrageous conduct, official immunity would almost

## 1. Malicious Prosecution

A claim for malicious prosecution requires proof of the following elements: "1) commencement of an earlier suit against plaintiff; 2) instigation of the suit by defendant; 3) termination of the suit in plaintiff's favor; 4) lack of probable cause for the suit; 5) malice by defendant resulting in the suit; and 6) damage to plaintiff resulting from the suit." *State ex rel. Police Retirement Sys. of St. Louis v. Mummert*, 875 S.W.2d 553, 555 (Mo. 1994) (en banc).

As Plaintiff himself argues in the context of other claims, Smith's appointment as Special Prosecutor in Plaintiff's criminal matter gave her final decisionmaking authority concerning the criminal proceedings against Plaintiff, including the decision whether to institute the proceedings. *See* Mo. Rev. Stat. § 56.060 ("Each prosecuting attorney shall commence and prosecute all civil and criminal actions . . ."); *State v. Binnington*, 978 S.W.2d 774, 777 (Mo. Ct. App. 1998) ("The prosecutor alone has the discretion to determine whether a criminal proceeding should be instituted."); Mo. Rev. Stat. § 56.110 (providing for appointment of special prosecutor); Mo. Rev. Stat. § 56.130 (appointed special prosecutor "shall have the same power as the proper officer would if he was present"). In addition to their lack of authority, there is also no indication in the record that Steward, Gooch, Swope, or Boerding was involved in Smith's ultimate decision to bring Doe's allegations before the grand jury. As such, Plaintiff has failed to present any evidence of the second element of malicious prosecution – instigation of the suit by the defendant – as to these Defendants, and they are therefore entitled to summary judgment on Plaintiff's malicious prosecution claims.

---

certainly not apply if Plaintiff can in fact prove all the elements of these torts. Accordingly, the Court turns directly to the elements of Plaintiff's claims.

## 2. Intentional Infliction of Emotional Distress

"Missouri case law reveals very few factual scenarios sufficient to support a claim for [intentional infliction of emotional distress]." *Bailey v. Bayer CropScience L.P.*, 563 F.3d 302, 310 (8th Cir. 2009) (Missouri law) (internal quotations and citations omitted). The tort of intentional infliction of emotional distress, or IIED, consists of the following elements: (1) the defendant's conduct was outrageous or extreme; (2) the defendant acted intentionally or recklessly; (3) the plaintiff suffered extreme emotional distress resulting in bodily harm; (4) the defendant's conduct caused that harm; and (5) that conduct was solely intended to cause extreme emotional distress to the plaintiff. *Crow v. Crawford & Co.*, 259 S.W.3d 104, 119 (Mo. Ct. App. 2008). Conduct is actionable as extreme or outrageous only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hampton v. Carter Enters., Inc.*, 238 S.W.3d 170, 175-76 (Mo. Ct. App. 2007); *see also Polk v. INROADS / St. Louis, Inc.*, 951 S.W.2d 646, 648 (Mo. Ct. App. 1997) ("The court must determine whether an average member of the community upon learning of the facts alleged by plaintiff would exclaim 'outrageous!'") (internal quotations and citations omitted).

The last element – that the defendant's sole motivation must have been to cause emotional distress to the plaintiff – is required because the tort is not intended to overlap with existing causes of action; thus, an IIED claim is not viable "where the conduct was intended to invade other legally protected interests of the plaintiff or to cause bodily harm." *Sansonetti v. City of St. Joseph*, 976 S.W.2d 572, 580 (Mo. Ct. App. 1998); *see also Thomas v. Special Olympics Mo., Inc.*, 31 S.W.3d 442, 448 (Mo. Ct. App. 2000) ("In order to recover under this theory, one must allege not just that the actor knew that emotional distress would result from his or her acts, but

that this was the *sole* motivation for the actor's conduct.  Only in this way can the tort be kept within reasonable bounds.") (emphasis in original).

With respect to Steward, Plaintiff claims that his failure "to conduct a prudent and unbiased investigation into the criminal allegation" satisfies the elements of IIED, but Plaintiff has not offered any evidence supporting the inference that Steward intended to cause Plaintiff emotional distress – let alone that it was his sole intent in conducting the investigation.  Plaintiff asserts that Steward "delayed discovery of the most material physical evidence until after the Grand Jury," but as discussed above, law enforcement had no duty to perform certain forensic tests as a prerequisite to obtaining a valid indictment, and in any event, the record indicates that it was ultimately Smith's decision not to seek DNA evidence before the indictment.  Likewise, Plaintiff has not refuted Smith's uncontroverted testimony that the strategy aimed at persuading Plaintiff to testify before the grand jury was her own decision – i.e., not Steward's.

Plaintiff also claims that Steward "deliberately misrepresented [to the grand jury] the nature and existence of scientific evidence that would have impeached the credibility of the purported victim."  Specifically, Plaintiff asserts that Steward told the grand jury that DNA testing was still on-going, when in fact the DNA tests comparing Doe's and MP's DNA with the original samples had already been completed.  Assuming that this is true,[14] it still not does not establish

---

[14] Plaintiff appears to base this allegation on a fairly confusing piece of deposition testimony from Smith.  When asked what Steward told the grand jury about the DNA evidence, Smith stated:

> In general, I can't quote him because I don't remember.  I do know that it – we had some preliminary conversations from Brian Hoey that there were . . . that there may; may have been some initial results.  I don't remember whether it was the chin, or the breast, or the back, but that results were ongoing, which was consistent with what I had been verbally told by Sam Steward, and what I had been told with [sic] Brian Hoey.

In the Court's view, the more reasonable reading of this testimony is that Smith states that she does not remember what Steward said, and instead refers to her general understanding of the state

that Steward's sole intent in so testifying was to cause emotional distress to Plaintiff; the inference is that Steward's intent was to secure the indictment. Moreover, if Plaintiff could in fact prove that Steward lied before the grand jury, that is not a matter that IIED claims are intended to remedy. *See Sansonetti*, 976 S.W.2d at 580.

Lastly, Plaintiff asserts that Steward is liable for IIED based on his failure to inform the grand jury that tests revealed that MP's DNA was consistent with the DNA samples taken from Doe's breast and clothing. Smith's and Steward's uncontroverted testimony, however, establishes that she did not even ask Steward about that evidence; Steward's failure to launch into an unsolicited narrative concerning the police investigation does not demonstrate that he intended to cause Plaintiff emotional distress.

Turning to Plaintiff's claims against the remaining Defendants – Gooch, Swope, and Boerding – Plaintiff has likewise failed to raise a genuine issue of material fact as to whether their sole intent was to cause him emotional distress. Instead, Plaintiff's allegations against these Defendants – that they compelled him to give statements and take a polygraph under threat of termination, that they transmitted the file from the administrative investigation to Steward in violation of departmental policy, and that they suspended him without pay prior to a hearing – suggest that their intention was to remove Plaintiff from his employment and/or secure the indictment against him; there is no indication that their motive or design was to cause emotional distress. *Cf. Thomas v. Special Olympics Mo., Inc.*, 31 S.W.3d 442, 447-48 (Mo. Ct. App. 2000) (denial of reinstatement with Special Olympics not actionable where there was some evidence it was motivated by desire to avoid plaintiff's disruptive conduct); *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997) (Catholic diocese's actions concerning sexual assaults and subsequent

---

of the DNA evidence at the time of the grand jury proceeding.

cover-ups insufficient to support IIED claim because allegations did not support inference that causing emotional distress was sole motivation).

It is also relevant that there does not appear to be any evidence as to *why* these Defendants would wish to cause Plaintiff emotional distress. *See Bailey v. Bayer CropScience L.P.*, 563 F.3d 302, 311 (8th Cir. 2009) (Missouri law) (plaintiff's lack of interaction with supervisors prior to alleged incident suggests supervisors' sole intention was not to cause emotional distress). Nothing in the record suggests that Gooch, Swope, or Boerding had any prior relationship or experience with Plaintiff that would have motivated them to seek to cause him harm. Moreover, assuming any of their actions were in fact wrongful, an IIED claim is not the appropriate remedy because Plaintiff's work-related grievances are more squarely addressed by other causes of action, such as his § 1983 procedural due process claims, or by available administrative remedies. *See Sansonetti*, 976 S.W.2d at 580.

In sum, the Court concludes that Steward, Gooch, Swope, and Boerding are entitled to summary judgment on Plaintiff's claims for intentional infliction of emotional distress because the evidence in the record is insufficient to raise a genuine issue of material fact as to whether these Defendants' sole motivation was to cause Plaintiff emotional distress.

### 3. Civil Conspiracy

In addition to the tort claims discussed above, Plaintiff also asserts claims for conspiracy to commit malicious prosecution and conspiracy to commit intentional infliction of emotional distress against these Defendants.

"Civil conspiracy is not a cause of action in and of itself; rather, it acts to hold the conspirators jointly and severally liable for the underlying tort." *8000 Maryland, LLC v. Huntleigh Fin. Servs. Inc.*, 292 S.W.3d 439, 451 (Mo. Ct. App. 2009). Accordingly, civil

conspiracy claims fail as a matter of law where the plaintiff fails to establish the underlying tort. *Haney v. Fire Ins. Exchange*, 277 S.W.3d 789, 793 (Mo. Ct. App. 2009). Thus, because Defendants are entitled to summary judgment on Plaintiff's malicious prosecution and intentional infliction of emotional distress claims, they are likewise entitled to summary judgment on his conspiracy claims.

Moreover, assuming that Plaintiff could base these Defendants' conspiracy liability on the tort claims against Smith which are barred by sovereign immunity,[15] Plaintiff has still failed to present sufficient evidence to survive summary judgment. A civil conspiracy is "an agreement to do an unlawful act or a lawful act done in an unlawful manner." *Gettings v. Farr*, 41 S.W.3d 539, 541 (Mo. Ct. App. 2001) (internal citations omitted). Accordingly, a claim for civil conspiracy requires proof of the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful acts; and (5) damages." *Lyn-Flex West, Inc. v. Dieckhaus*, 24 S.W.3d 693, 700 (Mo. Ct. App. 1999).

Even if the Court assumes that Smith had some unlawful objective, or that Smith used unlawful means to achieve a lawful objective, Plaintiff has failed to allege or otherwise demonstrate that there was a meeting of the minds such that the other Defendants were aware the unlawfulness. As between Smith and Steward, there is no indication of any agreement or meeting that would make Steward aware of contemplated tortious conduct. The Court is likewise not aware of any evidence in the record suggesting that Smith ever met with the St. Charles

---

[15] Missouri authority might be read to suggest that the conspiracy claim would not be available in these circumstances, *see Conway v. St. Louis County*, 254 S.W.3d 159, 165 (Mo. Ct. App. 2008), but the Court is not convinced that the rationales behind sovereign, qualified, or official immunity would be served by essentially extending that immunity to co-conspirators who would not otherwise be immune from a direct suit in tort.

Defendants concerning the criminal investigation or prosecution, let alone that they were actually aware of an unlawful scheme.

The Court therefore concludes that summary judgment in favor of Defendants on Plaintiff's civil conspiracy claims is warranted. A claim alleging conspiracy to commit a certain tort is not viable in the absence of a cognizable underlying tort claim, and furthermore, Plaintiff has failed to establish the necessary conspiracy element of a meeting of the minds.

## IV.    CONCLUSION

Defendants are entitled to judgment in their favor on all of Plaintiff's § 1983 claims. Smith and Steward are entitled to summary judgment on Plaintiff's § 1983 claims alleging a failure to investigate exculpatory evidence, asserted against Smith solely in her official capacity and against Steward in his individual and official capacities. Plaintiff has failed to allege or otherwise demonstrate that an unconstitutional custom or policy brought about the alleged constitutional deprivation, precluding the official capacity claim against Smith, and his claims against both Smith and Steward fail because he had no constitutional right to pre-indictment DNA testing. With respect to Plaintiff's § 1983 *Brady* claims, summary judgment in favor of all Defendants is proper because *Brady*'s requirements concerning the disclosure of exculpatory evidence do not apply at the pre-indictment stage. The St. Charles Defendants are also entitled to judgment in their favor on Plaintiff's § 1983 procedural due process claims. To the extent Plaintiff claims that he was entitled to a hearing before his suspension, the criminal indictment provided a sufficient basis for these Defendants to suspend him without notice and a hearing. Plaintiff's failure to appeal that suspension means that his procedural due process claims concerning the post-deprivation process must be dismissed as not ripe for adjudication.

Defendants are likewise entitled to summary judgment on Plaintiff's state law tort claims for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy. Plaintiff's claims against Smith and the City of St. Charles are barred by sovereign immunity, which forecloses official capacity claims and claims against governmental entities absent a waiver. Plaintiff's malicious prosecution claims against Steward, Gooch, Swope, and Boerding fail because the uncontroverted evidence establishes that Smith was solely responsible for initiating the criminal prosecution, and summary judgment on the intentional infliction of emotional distress claims is proper because there is no genuine issue of material fact as to whether their sole intent was to cause Plaintiff emotional distress. Finally, the St. Charles Defendants are entitled to summary judgment on Plaintiff's civil conspiracy claims due to Plaintiff's failure to establish any underlying tort liability.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion to Dismiss and for Summary Judgment of Defendants James Gooch, Timothy Swope, Robert Boerding, and the City of St. Charles, Missouri [doc. #102] is **GRANTED**. These Defendants are entitled to summary judgment on Plaintiff's § 1983 *Brady* claims, his § 1983 procedural due process claims concerning his suspension without pay prior to notice and a hearing, and his state law tort claims for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy. Plaintiff's § 1983 procedural due process claims, to the extent Plaintiff alleges inadequate process following his suspension without pay, are unripe for adjudication and are therefore dismissed without prejudice.

**IT IS FURTHER ORDERED** that Defendant J. Sam Steward's Motion for Summary

Judgment [doc. #105] and Defendant Rachel A. Smith's Motion for Summary Judgment [doc.

#107] are **GRANTED**.

Dated this 11th Day of January, 2010.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE